STATE OF NORTH CAROLINA EX REL. JAMES A. GRAHAM, NORTH CAROLINA COMMISSIONER OF AGRICULTURE v. NASH JOHNSON AND SONS' FARMS, INC., A CORPORATION.

(Filed 25 November, 1964.)

**1. Agriculture § 8—**

Under the contract in question defendant provided baby chicks, feed, medication, and feed bins to certain farmers in the area, and such farmers furnished water, fuel, electricity, and labor and were paid a specified amount for each chicken raised. Defendant's employees had actual supervision of the flocks during the "grow-out operation." Defendant mixed the feed used from separate ingredients purchased by it. *Held:* The farmers raising the chicks were employees and not independent contractors, and defendant is exempt by the provisions of G.S. 106-95.1 from the inspection fee imposed by G.S. 106-99.

**2. Master and Servant § 3—**

If a person performing labor under contract is under the supervision and control of the employer in the performance of the work he is not an independent contractor even though the labor is performed on the servant's premises.

APPEAL by plaintiff, State of North Carolina, from *Hobgood, J.,* April 6, 1964 Session of WAKE.

The State instituted this action to collect $1,458.65, inspection taxes allegedly due from defendant under G.S. 106-99 for the period January 1-June 30, 1962. Defendant, claiming an exemption under G.S. 106-95.1, denies any liability. Under an agreed statement of facts Judge Hobgood concluded that defendant was not liable for the taxes and entered judgment accordingly. The State appealed. The original relator, L. Y.

Ballentine, having died pending this appeal, his successor in office, James A. Graham, upon motion of the Attorney General, has been substituted.

*Attorney General Bruton and Assistant Attorney General Ray B. Brady for the State.*
*Ervin, Horack, Snepp & McCartha for defendant.*

SHARP, J. The facts agreed are summarized as follows:

Defendant is a corporation engaged in farming approximately 3,500 acres of land which it owns in Duplin and Sampson Counties. As a part of its farming activities defendant conducts an integrated poultry-raising operation, producing about 8.5 million chickens per year. Defendant hatches 75% of its required baby chicks and buys the rest. It places 99% of the broods in broiler houses owned by other farmers in the area when the chicks are one day old. These farmers raise the chicks for defendant in what is termed a "grow-out operation." Under this arrangement the owners of the houses furnish the water, fuel, electricity, and labor necessary to raise the birds. Defendant provides the chicks, feed, medication, litter, and feed bins. When the birds reach the proper size, defendant's regular employees catch them and haul them to market. Defendant pays the owner of each house 6¼ cents for every bird thus caught and loaded. The farmer's compensation depends solely upon the number of birds he raises for market, not upon the amount of feed used or the price defendant receives when the birds are sold. After each flock is marketed, defendant decides whether to entrust the farmer with another.

Employees of defendant, known as servicemen, have active supervision of the flocks during the grow-out operation. They visit each flock at least once a week in order to check the manner of the birds' care, their growth, and their health, and generally to oversee the activities of the owners of the houses with respect to the birds. Defendant carries the flocks in its inventory and lists them for taxes.

To provide feed for its various poultry operations, defendant operates its own feed mill adjacent to its hatcheries. From time to time it purchases from suppliers and stores at its mill soy bean meal, corn gluten meal, alfalfa meal, phosphate, fish meal, poultry by-product meal, limestone, liquid animal fat, salt, corn distillers' solubles, wheat middling, whey, and dried brewers' yeast, whole corn, whole oats and medications. As feed is needed, the corn and oats are ground and mixed with the other materials according to formulas. Defendant has never registered

this feed under the provision of G.S. 106-96. After the feed is mixed, defendant's trucks transfer it in bulk to the various broiler houses, where it is placed in defendant's storage bins. When a particular flock is marketed, these bins are cleaned out, and defendant's trucks return the surplus feed to defendant's mill.

During the period in suit defendant used the total output of its feed mill for its own poultry business except for a small amount not involved here. Defendant raises turkeys, also, for market, but this operation is conducted entirely by regular employees of defendant on lands owned by defendant.

The statutory provisions applicable to this controversy are:

> G.S. 106-99. Inspection tax on feeding stuffs: Each and every manufacturer, importer, jobber, agent, or seller of any concentrated commercial feeding stuff, as defined in this article, shall pay to the Commissioner of Agriculture an inspection tax of twenty-five cents (25¢) per ton for each ton of such commercial feeding stuff sold, offered or exposed for sale or distributed in this State. This shall apply to all commercial feeding stuff furnished, supplied or used, for the growing or feeding under contract or agreement, of livestock, domestic animals and poultry, and shall also apply to any feeding stuffs which are produced by the purchase of grain or other materials and the grinding and mixing of same with concentrated commercial feeding stuff being used as a supplement or base. The requirements of this section, however, are subject to the following conditions:
>
> (1) If the concentrated commercial feeding stuff, used as a supplement or a base, has already been taxed under this article and the inspection tax paid, then the amount paid shall be deducted from the gross amount of tax due on the total feeding stuff produced.
>
> (2) Only that portion of a custom-mixed feed supplied by a farmer and used in custom-mixed feeds as defined in G.S. 106-95.1, shall be exempt from the feed inspection tax as provided for in this article."

> G.S. 106-95. "Commercial feeding stuffs" defined. — The term "commercial feeding stuffs" shall be held to include the so-called mineral feeds and all feeds used for livestock, domestic animals and poultry, except cottonseed hulls, whole unground hays, straw and corn stover, when the same are not mixed with other materials, nor shall it apply to whole unmixed, unground and uncrushed grains or seeds when not mixed with other materials."

G.S. 106-95.1. Custom-mixed feed. — A "custom-mixed feed" is a feed composed of grains or other feed materials grown or stored on the farm of a person, firm, or corporation engaged in farming and ground and mixed with a concentrate or base, for the sole purpose of being fed to the livestock, domestic animals or poultry of the said person, firm or ·corporation: Provided, this section shall not be construed as prohibiting a farmer from using grain grown or stored on neighboring farms when moved directly by him or his employee to a mill, to his own farm, or to a neighboring storage facility.

The State contends that the feed which defendant mixes and delivers to the farmers conducting its grow-out operations is "commercial feeding stuffs" as defined by G.S. 106-95, and that it is taxed by G.S. 106-99 as feed furnished for the growing of poultry "under contract." Defendant contends that it is "custom-mixed feed" as defined by G.S. 106-95.1 and exempt under G.S. 106-99(2). It is stipulated by plaintiff that no inspection tax is due or payable upon that portion of feed produced by defendant and used to feed the turkeys and the chickens (1% of its total chicken production) grown by defendant's regular employees on land owned or leased by it.

His Honor concluded as a matter of law that the feed was not subject to the inspection tax and dismissed the State's action. In this ruling we concur. The State concedes that the same feed which it seeks to tax when fed to defendant's chickens on a grow-out operation is not subject to the inspection tax when fed to defendant's turkeys and chickens raised on its own land by its regular employees. We can perceive no essential ·difference between the two operations. The chickens raised in other farmers' houses during the grow-out process still belong to defendant.

"Whether one is an independent contractor depends upon the extent to which he is, in fact, independent in performing the work. Broadly stated, if the contractor is under the control of the employer, he is a servant. . . ." *Lassiter v. Cline,* 222 N.C. 271, 273, 22 S.E. 2d 558, 560. Here, defendant's employees regularly supervise all grow-out operations, including the labor of the owners of the houses. The individual farmer who uses his own brooders is nonetheless the supervised employee of defendant so far as this operation is concerned. "(E)ven supposing . . . that the servant did live in his own house, if he were employed to furnish a certain number of shoes for a particular person by a fixed time, . . . he is a servant *quoad hoc.* . . ." Aston, J., in *Hart v. Aldridge,* 1 Cowp. 54, 56, 98 Eng. Rep. 964, 965 (K.B. 1774) (obiter).

The purpose of Gen. Stat. ch. 106, art. 9 is not to protect from himself a farmer who mixes his own feed, but to protect a farmer-buyer from the manufacturer-seller of concentrated, commercial feeds who might sell substandard or. mislabeled feedstuff. To that end, the law requires such feed to be registered with the Commissioner of Agriculture, and an analysis to be furnished him, G.S. 106-96. The feedstuff must be properly labeled and carry a guarantee, G.S. 106-93. It must be sold in packages. of prescribed weight, G.S. 106-94. The Commissioner is empowered ,to collect samples of feedstuff, and analyze them to determine the contents, G.S. 106-102. Penalties are provided for selling substandard feed, G.S. 106-102.1. To finance the cost of administering article 9, an inspection tax of 25 cents per ton is imposed upon commercial feedstuffs, G.S. 106-99.

Specifically, G.S. 106-95.1 exempts from the inspection ·tax in question custom-mixed feed produced by farmers for their own use. Defendant, instead of being within the class to be regulated, is, as a pur-chaser of commercial feedstuffs for use in the product it mixes for itself, one of those whom the law seeks to protect. When,defendant transfers feed from its own mill to its own bins for use in feeding its own chickens — even though they are "growing out" on the lands of. its employees —, it is not *distributing* feed or *furnishing* feed for the growing of poultry under contract within the meaning of G.S. 106-99. "Surely, it is not necessary to recite sustained authority for the statement that one cannot distribute to himself." *Union Oil Co. v. State*, 2 Wash. 2d 436, 440, 98 P. 2d 660, 662.

The judgment of the court below is
Affirmed.